**UNITED STATES DISTRICT COURT**
**DISTRICT OF MARYLAND**

| | |
|---|---|
| ANGELA RITCHIE and RACHEL ROGERS, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>LUMINIS HEALTH, INC.,<br><br>Defendant. | Case No. 1:26-cv-03663<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

**CLASS ACTION COMPLAINT**

Plaintiffs Angela Ritchie and Rachel Rogers ("Plaintiffs"), individually and on behalf of all others similarly situated, bring this Class Action Complaint against Defendant Luminis Health, Inc. ("Defendant" or "Luminis"), and allege, upon personal knowledge, counsel's investigation, and information and belief, as follows:

**INTRODUCTION**

1. Plaintiffs bring this class action against Defendant for its failure to properly secure and safeguard Plaintiffs' and other similarly situated current and former patients' ("Class Members," defined *infra*) sensitive personally identifiable information ("PII") and protected health information ("PHI") (PII and PHI together, "Private Information").

2. Healthcare entities that handle PII and PHI owe a non-delegable duty to the individuals to whom that data relates. This duty arises because it is foreseeable that its exposure to unauthorized persons—especially to hackers with nefarious intentions—will result in harm to the individuals to whom the information relates.

3. The harm resulting from a data breach manifests in a number of ways, including identity theft and financial or medical fraud. The exposure of a person's PII or PHI through a data breach ensures that such person will be at a substantially increased and certainly impending risk of identity theft crimes compared to the rest of the population, potentially for the rest of their lives. Mitigating that risk requires individuals to devote significant time and money to closely monitor their credit, financial accounts, health records, and email accounts, and take additional prophylactic measures.

4. Defendant Luminis is a Maryland-based healthcare system, with "more than 700 inpatient beds and nearly 100 sites of care across the region."[1]

5. By obtaining, collecting, using, and deriving a benefit from the Private Information of Plaintiffs and Class Members, Defendant assumed a resulting duty to secure, maintain, protect, and safeguard that Information against unauthorized access and disclosure through adequate security measures. Defendant is also aware that PII and PHI are highly valuable to cybercriminals, making it foreseeable that Defendant would be the target of a cyberattack.

6. Despite Defendant's duty to safeguard the PII and PHI with which it was entrusted, as well as the foreseeability of a data breach, Plaintiffs' and Class Members' Private Information was accessed and acquired when Defendant Luminis experienced a cyber security incident, which Luminis announced on September 4, 2026 (the "Data Breach" or "Breach").[2] Publicly available information regarding the Data Breach is scant; Defendant simply acknowledged that the Data

---

[1] Luminis Health, LINKEDIN, https://www.linkedin.com/company/luminishealth/about/ (last visited Sept. 16, 2026).

[2] Steve Alder, *Luminis Health Working to Restore Systems After Cyberattack*, THE HIPAA J. (Sept. 7, 2026), https://www.hipaajournal.com/luminis-health-jeffrey-reuben-well-child-horizon-eye-care-data-breaches/.

Breach was carried out by an "unauthorized criminal actor," and that its investigation is "ongoing."[3]

7. As a direct and proximate result of Defendant's failure to implement and follow basic, standard security procedures, Plaintiffs' and Class Members' PII and PHI have been compromised by cybercriminals and disclosed to unauthorized persons. Plaintiffs and Class Members have suffered harm and remain at a significantly increased and certainly impending risk of fraud, identity theft, misappropriation of health insurance benefits, intrusion of their health privacy, and similar forms of criminal activity—risks which may last for the rest of their lives. Consequently, Plaintiffs and Class Members must devote substantially more time, money, and energy to protect themselves, to the extent possible, from these crimes.

8. Defendant disregarded the rights of Plaintiffs and Class Members by intentionally, willfully, recklessly, or negligently failing to implement and maintain adequate and reasonable measures to ensure that the Private Information of Plaintiffs and Class Members was safeguarded, failing to take available steps to prevent an unauthorized disclosure of data, and failing to follow applicable, required, and appropriate protocols, policies, and procedures regarding the encryption of data, even for internal use. As a result, the Private Information of Plaintiffs and Class Members was compromised through disclosure to an unknown and unauthorized third party.

9. Plaintiffs bring this action on behalf of all persons whose Private Information was compromised as a result of Defendant's failure to: (i) adequately protect the Private Information of Plaintiffs and Class Members; (ii) warn Plaintiffs and Class Members of Defendant's inadequate information security practices; (iii) timely alert Plaintiffs and Class Members of the Data Breach;

---

[3] *Luminis Health Cybersecurity Incident Update*, LUMINIS HEALTH (Sept. 10, 2026), https://www.luminishealth.org/en/cybersecurity-incident-update?language_content_entity=en.

and (iv) effectively secure its network containing protected Private Information using reasonable and effective security procedures free of vulnerabilities and incidents. Defendant's conduct amounts to negligence and violates federal and state statutes.

10. Plaintiffs, individually and on behalf of the Class, bring claims against Defendant for negligence, breach of implied contract, and unjust enrichment, and seek declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

## **PARTIES**

11. Plaintiff Angela Ritchie is, and at all relevant times was, a resident and citizen of Anne Arundel County, Maryland. In connection with obtaining healthcare services from Defendant Luminis, Plaintiff Ritchie was required to provide it with her sensitive Private Information.

12. Plaintiff Ritchie has suffered actual injury from having her Private Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and monitoring her financial accounts for potential fraud and identity theft; (b) damages to and diminution of the value of her Private Information, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous, imminent, and impending injury arising from the increased risk of financial identity theft and fraud.

13. As a result of the Data Breach, Plaintiff Ritchie's sensitive Private Information was compromised, and Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

14. Plaintiff Rachel Rogers is, and at all relevant times was, a resident and citizen of Anne Arundel County, Maryland. In connection with obtaining healthcare services from Defendant Luminis, Plaintiff Rogers was required to provide it with her sensitive Private Information.

15. Plaintiff Rogers has suffered actual injury from having her Private Information exposed and/or stolen as a result of the Data Breach, including: (a) required mitigation efforts, including researching the Data Breach and monitoring her financial accounts for potential fraud and identity theft; (b) damages to and diminution of the value of her Private Information, a form of intangible property that loses value when it falls into the hands of criminals; (c) loss of privacy; and (d) continuous, imminent, and impending injury arising from the increased risk of financial identity theft and fraud.

16. As a result of the Data Breach, Plaintiff Rogers' sensitive Private Information was compromised, and Plaintiff will continue to be at a substantial and certainly impending risk for fraud and identity theft, and their attendant damages, for years to come.

17. Defendant Luminis is a Maryland corporation, with its principal place of business at 2001 Medical Parkway, Annapolis, Maryland 21401.

## JURISDICTION AND VENUE

18. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332(d)(2)(A), as modified by the Class Action Fairness Act of 2005, because at least one member of the Class, as defined below, is a citizen of a different state than Defendant, there are more than 100 members of the Class, and the aggregate amount in controversy exceeds $5,000,000 exclusive of interests and costs.

19. This Court has personal jurisdiction over Defendant because Defendant resides in this District and a substantial part of the events, omissions, and acts giving rise to the claims herein occurred in this District.

20. Venue is proper in this District under 28 U.S.C. §1391(b) because Defendant resides in this District, regularly conducts business in this District, and a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## FACTUAL ALLEGATIONS

### A. Defendant Collected and Stored Plaintiffs' and Class Members' PII and PHI

21. Defendant Luminis is a "nationally recognized health system in Maryland[,]" with "more than 700 inpatient beds and nearly 100 sites of care across the region[.]"[4]

22. In the regular course of its business, Defendant collects and maintains the PII/PHI of its patients and other persons to whom it is currently providing or previously provided healthcare services.

23. Defendant requires patients to provide it with their Private Information before it provides healthcare services. That information includes, *inter alia*, names, addresses, dates of birth, and Social Security numbers, and health insurance information, as well as information regarding prior care, such as medical record numbers and treatment information, including diagnoses and dates/types of treatment. Defendant stores this information digitally.

24. Plaintiffs and Class Members entrusted Defendant with their sensitive and confidential PII and PHI and, therefore, reasonably expected that Defendant would safeguard their highly sensitive PII and keep their PHI confidential.

25. Due to the sensitivity of the PII and PHI that Defendant handles, collects, and stores, Defendant was aware of its critical responsibility to safeguard this information—and, therefore, how devastating its theft is to individuals whose information has been stolen.

26. By requesting, obtaining, collecting, storing, and deriving benefits from Plaintiffs' and Class Members' PII and PHI, Defendant assumed equitable and legal duties to safeguard and keep confidential Plaintiffs' and Class Members' highly sensitive information, to only use this information for business purposes, and to only make authorized disclosures.

[4] LINKEDIN, *supra* note 1.

27. Defendant, in its Notice of Privacy Practices, acknowledges the importance of safeguarding PII and PHI, stating that it is "required by law" to:

- Make sure your protected health information is kept private;
- Give you this Notice of our legal duties and privacy practices with respect to your medical information;
- Notify you if there is a breach of your unsecured protected health information that compromises the privacy or security of your protected health information;
- Follow the terms of the Notice that is currently in effect.[5]

28. Despite Defendant's representations and the existence of its duties, it failed to implement reasonable data security measures to protect Plaintiffs' and Class Members' Private Information and ultimately allowed threat actors to compromise it.

**B. The Risks of Storing Valuable PII and PHI Are Well Known in the Healthcare Industry**

29. Given its frequent handling of sensitive data, Defendant was aware at all relevant times that the PII and PHI that it obtains, collects, stores, uses, and derives a benefit from is highly sensitive and is of significant value to those who seek to use it for wrongful purposes.

30. Defendant also knew that a breach of its data systems, and the exposure of the information stored therein, would result in the imminent risk of identity theft and fraud for the individuals whose PII and PHI were compromised, as well as intrusion into their highly private health information.

31. These risks are not theoretical; in recent years, data breaches at healthcare companies have become ubiquitous, with a new breach seemingly announced every few days.[6]

---

[5] *Notice of Privacy Practices*, LUMINIS HEALTH, https://www.luminishealth.org/sites/default/files/2026-02/26-HIMR-0040_-_Notice_of_Privacy_Practices_Update_Brochure-Final.pdf (last visited Sept. 15, 2026).

[6] *See* Steve Alder, *Healthcare Data Breach Statistics*, THE HIPAA J. (June 4, 2026), https://www.hipaajournal.com/healthcare-data-breach-statistics/.

The slew of healthcare data breaches over the last few years has surely put Defendant on notice that its electronic records will be targeted by cybercriminals.

32. PII and PHI have considerable value and constitute enticing and well-known targets for hackers. Hackers can easily sell stolen data, the "dark web's stolen data market operates at a measurable scale[,]" with "2.86 billion compromised credentials circulating across criminal markets in 2025 spanning infostealer malware, breach databases and underground marketplaces."[7] PHI, in addition to being of a highly personal and private nature, can be used for medical fraud and to submit false medical claims for reimbursement.

33. The prevalence of data breaches and identity theft has increased dramatically in recent years, accompanied by a parallel and growing economic drain on individuals, businesses, and government entities in the United States. A recent study found that there were 8,835 ransomware attacks in 2025—a 53% year-over-year increase—with the healthcare industry among the primary targets.[8]

34. In tandem with the increase in data breaches, the rate of identity theft complaints has also increased over the past few years. For instance, in 2025, the Federal Trade Commission's Consumer Sentinel Network received 6.2 million reports of some form of identity fraud compared to 5.3 million in 2022.[9]

---

[7] Sean Michael Kerner, *Data After the Breach: Economics of the Dark Web*, TECHTARGET (May 11, 2026), https://www.techtarget.com/searchsecurity/feature/Data-after-the-breach-Economics-of-the-dark-web.

[8] *2026 Global Threat Intelligence Report*, FLASHPOINT, https://irp.cdn-website.com/711a67a7/files/uploaded/Flashpoint_2026_Global_Threat_Intelligence_Report.pdf (last visited Sept. 16, 2026).

[9] *See* Consumer Sentinel Network Data Book, 2021-2025, FED. TRADE COMM'N, https://public.tableau.com/app/profile/federal.trade.commission/viz/ConsumerSentinel/Infographic (last visited Sept. 16, 2026).

35. The healthcare industry in particular has become a prime target for threat actors: "Cyber attacks occur in every industry and sector. However, healthcare organizations are at special risk, largely due to the fact that the information they produce and manage is a particularly alluring target for attackers."[10] Indeed, "[t]he IT environments of healthcare organizations are often complex and difficult to secure. Devices and software continue to be used that have reached end-of-life, as upgrading is costly and often problematic. Many healthcare providers use software solutions that have been developed to work on specific—and now obsolete—operating systems and cannot be transferred to supported operating systems."[11]

36. Cybercriminals seek out PHI at a greater rate than other sources of personal information. Between 2009 and 2025, 7,418 healthcare data breaches of 500 or more individuals were reported to Health and Human Services' Office of Civil Rights ("OCR").[12] Those breaches have resulted in the exposure of the PHI of 1,013,066,481 Americans, which equates to almost three times the United States' total population.[13]

---

[10] *The Healthcare Industry is at Risk*, ORDR (Feb. 20, 2024), https://ordr.net/learn/healthcare-cyber-attacks/.

[11] Steve Alder, *Why Do Criminals Target Medical Records*, THE HIPAA J. (Jan. 10, 2026), https://www.hipaajournal.com/why-do-criminals-target-medical-records.

[12] Steve Alder, *Healthcare Data Breach Statistics – Updated for 2026*, THE HIPAA J. (June 4, 2026), https://www.hipaajournal.com/healthcare-data-breach-statistics/.

[13] *Id.*




37. In fact, "[a]n unwanted record was set in 2023 with 725 large security breaches in healthcare reported to the Department of Health and Human Services Office for Civil Rights, beating the record of 720 healthcare security breaches set the previous year."[14] In 2023 alone, about one-third of Americans were affected by health-related data breaches.[15]

38. "In 2024, the protected health information of 276,775,457 individuals was exposed or stolen. On average, that is 758,288 records per day[.]"[16]

39. Thus far, in 2026, "772 healthcare data breaches affecting 500 of more individuals were reported to OCR."[17]

40. The breadth of data compromised in the Data Breach here makes the information particularly valuable to cybercriminals and leaves Plaintiffs and Class Members especially vulnerable to medical fraud, identity theft, tax fraud, credit and bank fraud, and more.

---

[14] Steve Alder, *Security Breaches in Healthcare in 2023*, THE HIPAA J. (January 31, 2024), https://www.hipaajournal.com/wp-content/uploads/2024/01/Security_Breaches_In_Healthcare_in_2023_by_The_HIPAA_Journal.pdf.

[15] Ken Alltucker, *Health Care Data Breaches Hit 1 in 3 Americans Last Year: Is Your Data Vulnerable?*, USA TODAY (Feb. 19, 2024), https://www.usatoday.com/story/news/health/2024/02/18/health-data-breaches-hit-new-record-2023/72507651007/.

[16] Vinay Krishna Gupta, *The New Era of Healthcare Modernization in 2026 & Beyond*, ANTINO (May 28, 2026), https://www.antino.com/blog/healthcare-modernization.

[17] Alder, *supra* note 14.

41. **Social Security Numbers**—Unlike credit or debit card numbers in a payment card data breach—which can quickly be frozen and reissued in the aftermath of a breach—unique SSNs cannot be easily replaced. Even when such numbers are replaced, the process of doing so results in major inconvenience to an individual, requiring a wholesale review of the person's relationships with government agencies and any number of private companies in order to update the person's accounts with those entities.

42. The Social Security Administration warns that the process of replacing a SSN is a difficult one that creates other problems, and that it will not be a panacea for the affected person:

> Keep in mind that a new number probably will not solve all your problems. This is because other governmental agencies (such as the IRS and state motor vehicle agencies) and private businesses (such as banks and credit reporting companies) likely will have records under your old number. Along with other personal information, credit reporting companies use the number to identify your credit record. So using a new number will not guarantee you a fresh start. This is especially true if your other personal information, such as your name and address, remains the same.
>
> If you receive a new Social Security Number, you should not be able to use the old number anymore.
>
> For some victims of identity theft, a new number actually creates new problems. If the old credit information is not associated with your new number, the absence of any credit history under the new number may make it more difficult for you to get credit.[18]

43. SSNs allow individuals to apply for credit cards, student loans, mortgages, and other lines of credit—among other services. Often SSNs can be used to obtain medical goods or services, including prescriptions. They are also used to apply for a host of government benefits. Access to such a wide range of assets makes SSNs a prime target for cybercriminals and a particularly attractive form of PII to steal and then sell.

---

[18] *Identify Theft and Your Social Security Numbers*, SOC. SEC. ADMIN. (June 2021), https://www.ssa.gov/pubs/EN-05-10064.pdf.

44. **Healthcare Records**—As indicated by a recent study: "We actually found that personal health records are the most valuable to threat actors, commanding approximately $300 per record. PINs follow at $196. Credit card numbers, which occupy an outsized share of both public attention and organizational security investment, rank eight at just $17."[19]

45. Indeed, medical records "are so valuable because they can be used to commit a multitude of crimes. … Healthcare data can be used to impersonate patients to obtain expensive medical services, Medicare and Medicaid benefits, healthcare devices, and prescription medications. Healthcare records also contain the necessary information to allow fraudulent tax returns to be filed to obtain rebates."[20]

46. "In contrast to credit card numbers and other financial information, healthcare data has an incredibly long lifespan and can often be misused for long periods undetected. Credit card companies monitor for fraud and rapidly block cards and accounts if suspicious activity is detected, but misuse of healthcare data is harder to identify and can be misused in many ways before any malicious activity is detected. During that time, criminals can run up huge debts—far more than is usually possible with stolen credit card information."[21]

47. Even if stolen PII and PHI does not include financial or payment card account information, that does not mean there has been no harm, or that the breach does not cause a substantial risk of identity theft. Indeed, even when cybercriminals do not gain access to a complete set of an individual's PII and PHI during a data breach, cybercriminals can cross-reference two or more sources of PII and PHI to marry data available elsewhere with criminally stolen data,

---

[19] Andréanne Bergeron & Renaud Bergeron, *What Is the Cost of Your Data on the Dark Web?*, FLARE (May 26, 2026), https://flare.io/learn/resources/blog/cost-of-data-dark-web.

[20] Alder, *supra* note 11.

[21] *Id.*

resulting in complete and accurate dossiers on individuals. These dossiers are known as "Fullz" packages.

48. The development of Fullz packages means stolen PII from a data breach can easily be linked to victims' phone numbers, email addresses, and other unregulated sources and identifiers. In other words, even if certain information (such as emails, phone numbers, or credit card numbers) is not included in the PII stolen in a specific incident, criminals can easily create a Fullz package that links that information together and sell the package at a higher price.

49. Importantly, once a cybercriminal has a Fullz package, they can use it to commit a host of criminal acts including: credit card fraud, loan fraud, identity fraud, account take-overs, medical identity fraud, tax refund fraud, and buy now pay later frauds.[22] Most problematic, however, is that cybercriminals in possession of a Fullz package "are difficult to stop with ordinary online security and ID verification measures because they possess all the information needed to get past typical authentication measures."[23]

50. Based on the value of individuals' PII and PHI to cybercriminals, and the foreseeability of a data breach, Defendant knew or should have known the importance of safeguarding the PII and PHI entrusted to it and of the foreseeable consequences that would arise if its data security systems were breached. Defendant failed, however, to take adequate cybersecurity measures to prevent the Data Breach from occurring.

---

[22] Paige Tester, *What Are Fullz? How Hackers and Fraudsters Obtain and Use Fullz*, DATADOME (Dec. 18, 2025), https://datadome.co/guides/account-takeover/what-are-fullz-how-do-fullz-work/.

[23] *Protection Against Fullz and Fraud*, INTEGRITY (Apr. 18, 2022), https://integrity.aristotle.com/2022/04/protection-against-fullz-and-fraud/.

**C. Defendant Breached Its Duties to Protect Private Information**

51. On or about September 3, 2026, Defendant Luminis experienced the Data Breach, which led to unauthorized access to Defendant Luminis's computer systems, and, additionally, forced Defendant to reroute patients away from its Anne Arundel Medical Center,[24] and delayed cancer treatments and test results almost a week after the Breach occurred.[25]

52. Defendant announced the Data Breach on September 4, 2026, but included scant details.[26] Specifically, Defendant failed to identify how its data systems were compromised, the identity of the threat actor(s) who carried out the hack, when the hack occurred, what patient information was compromised or potentially compromised in the hack, and other pertinent details to assist Plaintiffs and Class Members with mitigation efforts.

53. As a direct and proximate result of Defendant's failure to implement and maintain adequate security measures, Plaintiffs' and Class Members' PII and PHI were exposed to unknown, malicious actors during the Data Breach. It will be nearly impossible for Plaintiffs and the Class to ensure that their stolen PII and PHI have been secured and not further disseminated.

54. Plaintiffs further believe that Plaintiffs' and Class Members' Private Information was subsequently sold on the dark web following the Data Breach, as that is the *modus operandi* of cybercriminals that commit cyber-attacks of this type.

---

[24] David Collins, *Luminis Health cyberattack forces Ann Arundel Medical Center to reroute patients*, WBALTV 11 (Sept. 3, 2026), https://www.wbaltv.com/article/anne-arundel-medical-center-cyberattack/73596317.

[25] Kate Amara, *Luminis Health cyberattack delays cancer treatment and test results*, WBALTV 11 (Sept. 9, 2026), https://www.wbaltv.com/article/anne-arundel-medical-center-cyberattack-delays-treatment/73656787.

[26] *Luminis Health Cybersecurity Incident Update*, *supra* note 3.

**D. Defendant Failed to Comply with HIPAA Requirements**

55. Defendant is a healthcare provider under HIPAA (45 C.F.R. § 160.102) and is required to comply with the HIPAA Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C.

56. Defendant is subject to the rules and regulations for safeguarding electronic forms of medical information pursuant to the Health Information Technology Act ("HITECH").[27] *See* 42 U.S.C. §17921, 45 C.F.R. § 160.103.

57. HIPAA's Privacy Rule or *Standards for Privacy of Individually Identifiable Health Information* establishes national standards for the protection of health information.

58. HIPAA's Privacy Rule or *Security Standards for the Protection of Electronic Protected Health Information* establishes a national set of security standards for protecting health information that is kept or transferred in electronic form.

59. HIPAA requires "compl[iance] with the applicable standards, implementation specifications, and requirements" of HIPAA "with respect to electronic protected health information." 45 C.F.R. § 164.302.

60. "Electronic protected health information" is "individually identifiable health information . . . that is (i) transmitted by electronic media; maintained in electronic media." 45 C.F.R. § 160.103.

61. HIPAA's Security Rule requires Defendant to do the following:

[27] HIPAA and HITECH work in tandem to provide guidelines and rules for maintaining protected health information. HITECH references and incorporates HIPAA.

a. Ensure the confidentiality, integrity, and availability of all electronic protected health information the covered entities or business associates creates, receives, maintains, or transmits;

b. Protect against any reasonably anticipated threats or hazards to the security or integrity of such information;

c. Protect against any reasonably anticipated uses or disclosures of such information that are not permitted; and

d. Ensure compliance by their workforces.

62. HIPAA also requires Defendant to "review and modify the security measures implemented . . . as needed to continue provision of reasonable and appropriate protection of electronic protected health information." 45 C.F.R. § 164.306(e).

63. Additionally, Defendant is required under HIPAA to "[i]mplement technical policies and procedures for electronic information systems that maintain electronic protected health information to allow access only to those persons or software programs that have been granted access rights." 45 C.F.R. § 164.312(a)(1).

64. HIPAA and HITECH also obligated Defendant to implement policies and procedures to prevent, detect, contain, and correct security violations, and to protect against uses or disclosures of electronic protected health information that are reasonably anticipated but not permitted by the privacy rules. *See* 45 C.F.R. § 164.306(a)(1) and § 164.306(a)(3); *see also* 42 U.S.C. §17902.

65. The HIPAA Breach Notification Rule, 45 C.F.R. §§ 164.400-414, also requires Defendant to provide notice of the Data Breach to each affected individual "*without unreasonable delay and in no case later than 60 days following discovery of the breach*."[28]

66. HIPAA requires a covered entity to have and apply appropriate sanctions against members of its workforce who fail to comply with the privacy policies and procedures of the covered entity or the requirements of 45 C.F.R. Part 164, Subparts D or E. *See* 45 C.F.R. § 164.530(e).

67. HIPAA requires a covered entity to mitigate, to the extent practicable, any harmful effect that is known to the covered entity of a use or disclosure of protected health information in violation of its policies and procedures or the requirements of 45 C.F.R. Part 164, Subpart E by the covered entity or its business associate. *See* 45 C.F.R. § 164.530(f).

68. HIPAA also requires the Office of Civil Rights ("OCR"), within the Department of Health and Human Services ("HHS"), to issue annual guidance documents on the provisions in the HIPAA Security Rule. *See* 45 C.F.R. §§ 164.302-164.318. For example, "HHS has developed guidance and tools to assist HIPAA covered entities in identifying and implementing the most cost-effective and appropriate administrative, physical, and technical safeguards to protect the confidentiality, integrity, and availability of e-PHI and comply with the risk analysis requirements of the Security Rule." U.S. Department of Health & Human Services, Security Rule Guidance Material.[29] The list of resources includes a link to guidelines set by the National Institute of Standards and Technology (NIST), which OCR says, "represent the industry standard for good

---

[28] *Breach Notification Rule*, U.S. DEP'T HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/breach-notification/index.html (last visited Sept. 16, 2026) (emphasis added).

[29] *Security Rule Guidance Material*, U.S. DEP'T HEALTH & HUM. SERVS., http://www.hhs.gov/hipaa/for-professionals/security/guidance/index.html (last visited Sept. 16, 2026).

business practices with respect to standards for securing e-PHI." U.S. Department of Health & Human Services, Guidance on Risk Analysis.[30]

**E. Defendant Failed to Follow FTC Guidelines**

69. Defendant was also prohibited by the Federal Trade Commission Act (the "FTC Act") (15 U.S.C. § 45) from engaging in "unfair or deceptive acts or practices in or affecting commerce." The Federal Trade Commission (the "FTC") has concluded that a company's failure to maintain reasonable and appropriate data security for consumers' sensitive personal information is an "unfair practice" in violation of the FTC Act. *See, e.g., FTC v. Wyndham Worldwide Corp.*, 799 F.3d 236 (3d Cir. 2015).

70. The FTC has promulgated numerous guides for businesses which highlight the importance of implementing reasonable data security practices. According to the FTC, the need for data security should be factored into all business decision-making.

71. In 2016, the FTC updated its publication, *Protecting Personal Information: A Guide for Business*, which established cybersecurity guidelines for businesses. The guidelines note that businesses should protect the personal information that they keep; properly dispose of personal information that is no longer needed; encrypt information stored on computer networks; understand their network's vulnerabilities; and implement policies to correct any security problems.

72. The guidelines also recommend that businesses use an intrusion detection system to expose a breach as soon as it occurs; monitor all incoming traffic for activity indicating someone is attempting to hack the system; watch for large amounts of data being transmitted from the system; and have a response plan ready in the event of a breach.

---

[30] *Guidance on Risk Analysis*, U.S. DEP'T HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/security/guidance/guidance-risk-analysis/index.html (last visited Sept. 16, 2026).

73. The FTC further recommends that companies not maintain personal information longer than is needed for authorization of a transaction; limit access to sensitive data; require complex passwords to be used on networks; use industry-tested methods for security; monitor for suspicious activity on the network; and verify that third-party service providers have implemented reasonable security measures.

74. The FTC has brought enforcement actions against businesses for failing to adequately and reasonably protect data, treating the failure to employ reasonable and appropriate measures to protect against unauthorized access to confidential consumer data as an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45. Orders resulting from these actions further clarify the measures businesses must take to meet their data security obligations.

75. These FTC enforcement actions include actions against healthcare providers and partners like Defendant. *See, e.g., In the Matter of LabMD, Inc., A Corp.*, 2016-2 Trade Cas. (CCH) ¶ 79708, 2016 WL 4128215, at *32 (MSNET July 28, 2016) ("[T]he Commission concludes that LabMD's data security practices were unreasonable and constitute an unfair act or practice in violation of Section 5 of the FTC Act.").

76. Defendant failed to properly implement basic data security practices.

77. Defendant's failure to employ reasonable and appropriate measures to protect against unauthorized access to Private Information constitutes an unfair act or practice prohibited by Section 5 of the FTC Act, 15 U.S.C. § 45.

78. Defendant was at all times fully aware of its obligation to protect the Private Information about whom it stored Private Information. Defendant was also aware of the significant repercussions that would result from its failure to do so.

79. Experts studying cybersecurity routinely identify patient-facing and other consumer-facing businesses as being particularly vulnerable to cyberattacks because of the value of the Private Information which they collect and maintain.

80. At a minimum, several best practices have been identified that should be implemented by patient-facing businesses such as Defendant. These include, but are not limited to, the following: (i) educating all employees about cybersecurity; (ii) requiring strong passwords; (iii) maintaining multi-layer security, including firewalls, anti-virus programs, and anti-malware software; (iv) utilizing encryption; making data unreadable without a key; (v) implementing multi-factor authentication; (vi) backing up data; and (vii) limiting which particular employees can access sensitive data.

81. Other best cybersecurity practices that are standard in the industry include (i) installing appropriate malware detection software; monitoring and limiting network ports; (ii) protecting web browsers and email management systems; (iii) setting up network systems such as firewalls, switches and routers; monitoring and protection of physical security systems; and (iv) training staff regarding critical points.

82. The foregoing frameworks are existing and applicable industry standards. Defendant failed to comply with these accepted standards, thereby opening the door to and causing the Data Breach.

**F. Defendant Failed to Comply with Industry Standards**

83. As described above, experts studying cybersecurity routinely identify healthcare providers and their business associates as being particularly vulnerable to cyberattacks because of the value of the PII and PHI which they collect and maintain.

84. Several best practices have been identified that at a minimum should be implemented by HIPAA covered business entities like Defendant, including but not limited to:

educating all employees; strong passwords; multi-layer security, including firewalls, anti-virus, and anti-malware software; encryption, making data unreadable without a key; multi-factor authentication; backup data; and limiting which employees can access sensitive data.

85. Other best cybersecurity practices that are standard in the healthcare industry include installing appropriate malware detection software; monitoring and limiting the network ports; protecting web browsers and email management systems; setting up network systems such as firewalls, switches, and routers; monitoring and protection of physical security systems; protection against any possible communication system; and training staff regarding critical points.

86. Defendant failed to meet the minimum standards of any of the following frameworks: the NIST Cybersecurity Framework Version 1.1 (including without limitation PR.AC-1, PR.AC-3, PR.AC-4, PR.AC-5, PR.AC-6, PR.AC-7, PR.AT-1, PR.DS-1, PR.DS-5, PR.PT-1, PR.PT-3, DE.CM-1, DE.CM-4, DE.CM-7, DE.CM-8, and RS.CO-2), and the Center for Internet Security's Critical Security Controls (CIS CSC), which are all established standards in reasonable cybersecurity readiness.

87. These foregoing frameworks are existing and applicable industry standards in the healthcare industry, and Defendant failed to comply with these accepted standards, thereby opening the door to cybercriminals and causing the Data Breach.

**G. Defendant Knew That Criminals Target PII/PHI from Healthcare Entities**

88. Defendant's data security obligations were particularly important given the substantial increase in cyberattacks and/or data breaches in the healthcare industry and other industries holding significant amounts of PII and PHI preceding the date of the breach, as well as Defendant's own experience with a cyberattack in April 2024 which similarly compromised its patients' sensitive PII and PHI.

89. At all relevant times, Defendant knew, or should have known, Plaintiffs' and all other Class Members' PII/PHI was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiffs' and Class Members' Private Information from cyberattacks that Defendant should have anticipated and guarded against.

90. "Hospitals store an incredible amount of patient data. Confidential data that's worth a lot of money to hackers who can sell it on easily – making the industry a growing target."[31]

91. Cybercriminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, the healthcare compliance company Bluesight found there were 1,160 medical data breaches in 2024, with a staggering 300 million patient records expose—a 26% increase from 2023.[32]

92. In 2025, the frequency of healthcare data breaches "more than doubled," according to Fortified Health Security's 2026 Horizon Report. Though fewer total patient records were implicated in 2025 medical data breaches as compared to 2024, the "[t]otal breach volume in 2025 surpassed 2024 by 112%[,]" indicating a new trend characterized by "[a]ttacks that come faster, hit more healthcare organizations, and strain teams through repetition rather than scale."[33]

93. Healthcare related breaches, in particular, have continued to rapidly increase because electronic patient data is seen as a valuable asset. In fact, entities that store patient

---

[31] *9 Reasons Why Healthcare Is the Biggest Target For Cyberattacks*, SWIVELSECURE, https://swivelsecure.com/solutions/healthcare/healthcare-is-the-biggest-target-for-cyberattacks/ (last visited Sept. 16, 2026).

[32] *2025 Breach Barometer*, BLUESIGHT (2025), https://bluesight.com/wp-content/uploads/2025/02/2025-Breach-Barometer-Annual-Report.pdf (last visited Sept. 16, 2026).

[33] Jill Hughes, *2025: Double the Breaches, but Less Patient Data Compromised*, INFORMA TECHTARGET (Jan. 15, 2026), https://www.techtarget.com/healthtechsecurity/news/366637268/2025-Double-the-breaches-but-less-patient-data-compromised.

information "have emerged as a primary target because they sit on a gold mine of sensitive personally identifiable information for thousands of patients at any given time. From social security and insurance policies, to next of kin and credit cards, no other organization, including credit bureaus, have so much monetizable information stored in their data centers."[34]

94. According to a 2025 report released by IBM Security and the Ponemon Institute, "healthcare recorded the highest average breach cost among industries for the 12th consecutive year[,]" and such breaches "took the longest to identify and contain[.]"[35]

95. Private Information is a valuable property right.[36] The value of Private Information as a commodity is measurable.[37] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[38]

---

[34] Eyal Benishti, *How to Safeguard Hospital Data from Email Spoofing Attacks*, CHIEF HEALTHCARE EXEC. (April 4, 2019), https://www.chiefhealthcareexecutive.com/view/how-to-safeguard-hospital-data-from-email-spoofing-attacks

[35] *Cost of a Data Breach Report 2025: The AI Oversight Gap*, IBM SEC. & PONEMON INST., https://www.ibm.com/downloads/documents/us-en/131cf87b20b31c91 (last visited Sept. 16, 2026).

[36] *See* Marc van Lieshout, *The Value of Personal Data*, 457 IFIP ADVANCES IN INFO. & COMMC'N TECH. 26 (May 2015), https://www.researchgate.net/publication/283668023 ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible...").

[37] *See Healthcare Data Breach Statistics 2025: Why Medical Records Are Worth 10× More Than Credit Cards*, PATIENT PROTECT (Nov. 4, 2025), https://www.patient-protect.com/post/healthcare-data-breach-statistics-2025-why-medical-records-are-worth-10-more-than-credit-cards.

[38] *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD Digital Economy Papers, No. 220, OECD PUBL'G (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

96. In 2022, the global data broker market was valued at $248 billion "and is projected to grow to $540.17 billion by 2030."[39] Moreover, the average American is "tracked by 540 companies via 3,180 data points."[40] Private Information is so valuable to identity thieves that once it has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

97. As a result of its real value and the recent large-scale data breaches, identity thieves and cybercriminals have openly posted credit card numbers, SSNs, PHI/PII, and other sensitive information directly on various internet websites, making the information publicly available. This information, from various breaches including the information exposed in the Data Breach, can be aggregated and become more valuable to thieves and more damaging to victims.

98. PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[41] A cybercriminal who steals a person's PHI can end up with as many as "seven to 10 personal identifying characteristics of an individual."[42] A 2026 study found that the "average victim of medical identity theft spends more than 200 hours and approximately $13,500 attempting to repair the damage[,]" and "[o]nly 10% achieve a satisfactory resolution."[43]

---

[39] Data Broker Statistics, WORLDMETRICS, https://worldmetrics.org/data-brokers-statistics/ (last visited Sept. 16, 2026).

[40] *Id.*

[41] *See* Andrew Steger, *What Happens to Stolen Healthcare Data?*, HEALTHTECH MAG. (Oct. 30, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[42] *Id.*

[43] Adrian Cheek, *Stolen Medical Records Fuel a Black Market of Fraud, Identity Theft, and Patient Harm*, FLARE (June 15, 2026), https://flare.io/learn/resources/blog/stolen-medical-records-fuel-black-market-fraud-identity-theft-patient-harm.

99. Currently, health records sold at an average price of $300, and bank details sell for $69 on average.[44] Experian reports that a stolen credit or debit card number can sell for $10 to $240 on the dark web.[45] Criminals can also purchase access to entire company data breaches from $900 to $4,500.[46] According to a recent report, criminals can sell healthcare records for over 17 times the price of a stolen credit card number.[47]

100. Criminals can use stolen Private Information to extort a financial payment by "leveraging details specific to a disease or terminal illness."[48] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[49]

101. Consumers place a high value on the privacy of that data. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies

---

[44] *See* Andréanne Bergeron, *supra* note 19.

[45] Ben Luthi, *Here's What Your Data Sells for on the Dark Web*, EXPERIAN (June 30, 2025), https://www.experian.com/blogs/ask-experian/heres-how-much-your-personal-information-is-selling-for-on-the-dark-web/.

[46] *In the Dark*, VPNOVERVIEW.COM, https://vpnoverview.com/privacy/anonymous-browsing/in-the-dark/ (last visited Sept. 16, 2026).

[47] *See* Andréanne Bergeron, *PHI Is the Most Expensive PII On the Dark Web*, FLARE (June 2, 2026), https://flare.io/learn/resources/blog/healthcare-record-costs-dark-web.

[48] *See* Andrew Steger, *supra* note 41.

[49] *Id.*

confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[50]

102. Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' Private Information has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

103. Indeed, cyberattacks against the healthcare industry have been common for over ten years with the FBI warning as early as 2011 that cybercriminals were "advancing their abilities to attack a system remotely" and "[o]nce a system is compromised, cyber criminals will use their accesses to obtain PII." The FBI further warned that that "the increasing sophistication of cyber criminals will no doubt lead to an escalation in cybercrime."[51]

104. By 2019, cyberattacks had become so notorious that the FBI and U.S. Secret Service have issued a warning to potential targets, so they are aware of, and prepared for, a potential attack. As one report explained, "[e]ntities like smaller municipalities and hospitals are attractive to ransomware criminals … because they often have lesser IT defenses and a high incentive to regain access to their data quickly.[52] Since then, such cyberattacks have only increased.

---

[50] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior, An Experimental Study*, 22(2) INFO. SYS. RSCH. 254 (June 2011), https://www.jstor.org/stable/23015560?seq=1.

[51] Gordon M. Snow, *Statement before the House Financial Services Committee, Subcommittee on Financial Institutions and Consumer Credit*, FBI (Sept. 14, 2011), https://archives.fbi.gov/archives/news/testimony/cyber-security-threats-to-the-financial-sector.

[52] Ben Kochman, *FBI, Secret Service Warn of Targeted Ransomware*, LAW360 (Nov. 18, 2019), https://www.law360.com/articles/1220974/fbi-secret-service-warn-of-targeted-ransomware.

105. In fact, according to a survey of healthcare IT and security professionals performed by Netwrix, in 2024, 84% of healthcare organizations detected cyberattacks.[53]

106. Defendant was on notice that the FBI has been concerned about data security in the healthcare industry since as early as August 2014, when, after a cyberattack on Community Health Systems, Inc., the FBI warned companies within the healthcare industry that hackers were targeting them. The warning stated that "[t]he FBI has observed malicious actors targeting healthcare related systems, perhaps for the purpose of obtaining the Protected Healthcare Information (PHI) and/or Personally Identifiable Information (PII)."[54]

107. Moreover, the American Medical Association ("AMA") also warned healthcare companies about the importance of protecting their patients' confidential information:

> Cybersecurity is not just a technical issue; it's a patient safety issue. AMA research has revealed that 83% of physicians work in a practice that has experienced some kind of cyberattack. Unfortunately, practices are learning that cyberattacks not only threaten the privacy and security of patients' health and financial information, but also patient access to care.[55]

108. As implied by the above AMA quote, stolen Private Information can be used to interrupt important medical services. This is an imminent and certainly impending risk for

[53] Steve Alder, *84% of Healthcare Organizations Detected a Cyberattack in the Past 12 Months,* THE HIPAA J. (Jan. 24, 2025), https://www.hipaajournal.com/84-of-healthcare-organizations-detected-a-cyberattack-in-the-past-12-months/.

[54] Jim Finkle, *FBI Warns Healthcare Firms that they are Targeted by Hackers*, REUTERS (Aug. 2014), https://www.reuters.com/article/us-cybersecurity-healthcare-fbi/fbi-warns-healthcare-firms-they-are-targeted-by-hackers-idUSKBN0GK24U20140820 (last visited May 29, 2026).

[55] Andis Robeznieks, *Cybersecurity: Ransomware attacks shut down clinics, hospitals*, AM. MED. ASSOC. (Oct. 4, 2019), https://www.ama-assn.org/practice-management/sustainability/cybersecurity-ransomware-attacks-shut-down-clinics-hospitals.

Plaintiffs and Class Members. Indeed, a survey found that 72% of hacked healthcare organizations reported disruptions to patient care.[56]

109. The Office for Civil Rights ("OCR") urges the use of encryption of data containing sensitive personal information. As long ago as 2014, the Department fined two healthcare companies approximately two million dollars for failing to encrypt laptops containing sensitive personal information. In announcing the fines, Susan McAndrew, OCR's deputy director of health information privacy, stated "[o]ur message to these organizations is simple: encryption is your best defense against these incidents."[57]

110. Defendant was on notice that the federal government has been concerned about healthcare company data encryption practices. Defendant knew its employees accessed and utilized protected health information in the regular course of their duties, yet it appears that information was not encrypted.

111. Additionally, as companies became more dependent on computer systems to run their business,[58] e.g., working remotely as a result of the COVID-19 pandemic, and the Internet of Things ("IoT"), the danger posed by cybercriminals is magnified, thereby highlighting the need for adequate administrative, physical, and technical safeguards.[59]

---

[56] Jill Hughes, *72% of Hacked Healthcare Orgs Report Patient Care Disruptions*, TECHTARGET (Oct. 15, 2025), https://www.techtarget.com/healthtechsecurity/news/366632797/72-of-hacked-healthcare-orgs-report-patient-care-disruptions.

[57] *Stolen Laptops Lead to Important HIPAA Settlements*, U.S. DEP'T HEALTH & HUM. SERVS., (Apr. 22, 2014), https://wayback.archive-it.org/3926/20170127085330/https://www.hhs.gov/about/news/2014/04/22/stolen-laptops-lead-to-important-hipaa-settlements.html.

[58] *Implications of Cyber Risk for Financial Stability*, BD. GOVERNORS OF THE FED. RESERVE SYS., (May 12, 2022), https://www.federalreserve.gov/econres/notes/feds-notes/implications-of-cyber-risk-for-financial-stability-20220512.html.

[59] *Key Threats and Cyber Risks Facing Financial Services and Banking Firms in 2022*, PICUS SEC., (Mar. 24, 2022), https://www.picussecurity.com/key-threats-and-cyber-risks-facing-financial-services-and-banking-firms-in-2022.

112. Defendant was, or should have been, fully aware of the unique type and the significant volume of data on its server(s), amounting to potentially hundreds of thousands of individuals' detailed Private Information, and, thus, the significant number of individuals who would be harmed by the exposure of the unencrypted data.

113. As a HIPAA covered business, Defendant knew or should have known about its data security vulnerabilities and implemented enhanced and adequate protection, particularly given the nature of the Private Information stored in its unprotected files.

114. The injuries to Plaintiffs and Class Members were directly and proximately caused by Defendant's failure to implement or maintain adequate data security measures for the Private Information of Plaintiffs and Class Members.

115. The ramifications of Defendant's failure to keep secure the Private Information of Plaintiffs and Class Members are long lasting and severe. Once Private Information is stolen—particularly SSNs and PHI—fraudulent use of that information and damage to victims may continue for years.

**H. Plaintiffs and Class Members Suffered Damages**

116. For the reasons mentioned above, Defendant's conduct, which allowed the Data Breach to occur, caused Plaintiffs and Class Members significant injuries and harm in several ways. Plaintiffs and Class Members have already been caused to and must continue to devote time, energy, and money to: (1) closely monitor their medical statements, bills, records, and credit and financial accounts; (2) change login and password information on any sensitive account even more frequently than they already do; (3) more carefully screen and scrutinize phone calls, emails, and other communications to ensure that they are not being targeted in a social engineering or spear phishing attack; and (4) search for suitable identity theft protection and credit monitoring services, and pay to procure them.

117. Once PII and PHI are exposed, there is virtually no way to ensure that the exposed information has been fully recovered or protected against future misuse. For this reason, Plaintiffs and Class Members will need to maintain these heightened measures for years, and possibly for their entire lives, as a result of Defendant's conduct. Further, the value of Plaintiffs' and Class Members' PII and PHI has been greatly diminished by its exposure in the Data Breach.

118. As a result of Defendant's failures, Plaintiffs and Class Members are also at a substantially increased risk of identity theft, fraud, phishing attacks, and related cybercrimes following the Data Breach. Those who are affected experience heightened and prolonged anxiety and fear, as they will be at risk of falling victim to cybercrimes for years to come.

119. With respect to data breaches specifically in the healthcare sector, a study found that, between 2013 and 2023, 100% of PHI breaches included personal data and 86% included health data, both of which can be used by criminals to perpetrate identity theft and fraud."[60]

120. Another report stated that, "Actors buying and selling PII and PHI from healthcare institutions and providers in underground marketplaces is very common and will almost certainly remain so due to this data's utility in a wide variety of malicious activity ranging from identity theft and financial fraud to crafting of bespoke phishing lures."[61]

121. The reality is that cybercriminals seek nefarious outcomes from a data breach, and "stolen health data can be used to carry out a variety of crimes."[62]

---

[60] Nataliya D. Brantly, *The U.S. Health System Vulnerabilities*, 26 BMC HEALTH SERVS. RES. 32 (Dec. 5, 2025), https://pmc.ncbi.nlm.nih.gov/articles/PMC12781349/.

[61] Robert Lemos, *State-Sponsored Cyberattacks Target Medical Research*, DARK READING (Aug. 21, 2019), https://www.darkreading.com/threat-intelligence/state-sponsored-cyberattacks-target-medical-research.

[62] *See* Andrew Steger, *supra* note 41.

122. Health information in particular is likely to be used in detrimental ways. Cybercriminals can leverage sensitive personal health details and diagnoses to extort or coerce the victim and commit serious and long-term identity theft.[63]

123. Moreover, many victims of medical identity theft are not aware of the theft until long after it occurs; "[s]omeone may apply for a mortgage, for example, and learn their credit is ruined due to unpaid medical bills for care they didn't receive."[64]

124. Plaintiffs and Class Members are at continued risk because their Private Information remains in Defendant's systems, which have already been shown to be susceptible to compromise and attack and are subject to further attack so long as Defendant fails to undertake the necessary and appropriate security and training measures to protect the PII and PHI with which it was entrusted.

125. Additionally, Plaintiffs and Class Members have suffered emotional distress, increased risk of identity theft and financial fraud, and the unauthorized exposure of their private medical information to strangers as a result of the Data Breach.

126. In sum, Plaintiffs and Class Members suffered actual injury from having their Private Information compromised as a result of the Data Breach, including, but not limited to, as follows: (a) misuse of their compromised Private Information; (b) damage to and diminution in the value of their Private Information, a form of property that Defendant obtained from Plaintiffs and Class Members; (c) violation of their privacy, including the compromise of highly sensitive Private Information; (d) present, imminent, and impending injury arising from the increased risk

---

[63] *Id*.

[64] Michelle Andrews, *Someone Could Steal Your Medical Records and Bill You for Their Care*, NPR (July 26, 2023), https://www.npr.org/sections/health-shots/2023/07/26/1189831369/medical-identity-fraud-protect-yourself.

of identity theft and fraud; and (e) actual and potential out-of-pocket losses, including the loss of time and the loss of money.

## CLASS ALLEGATIONS

127. Plaintiffs bring this action individually and on behalf of all other similarly situated individuals pursuant to Fed. R. Civ. P. 23.

128. Plaintiffs seek to represent a Class of persons to be defined as follows:

> All individuals in the United States whose PII and/or PHI were compromised in the Data Breach.

129. Excluded from the Class are Defendant and its subsidiaries and affiliates, officers and directors, any entity in which has a controlling interest, the legal representative, heirs, successors, or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

130. The proposed class definition is based on the information available to Plaintiffs at this time. Plaintiffs may modify the class definition in an amended pleading or when Plaintiffs move for class certification as necessary to account for any newly learned or changed facts as the situation develops and discovery gets underway.

131. **Numerosity:** The members of the Class are so numerous that the joinder of all members is impractical. The exact size of the Class and the identities of the individual members are ascertainable through Defendant's records, including but not limited to the files implicated in the Data Breach. Based on the public information currently available, the Class includes tens of thousands of Defendant's current and former patients. Class membership is defined using objective criteria, and Class Members may be readily identified through Defendant's books and records.

132. **Commonality:** This action involves questions of law and fact common to the Class. Such common questions include but are not limited to:

a. Whether and to what extent Defendant had a duty to protect the PII and PHI of Plaintiffs and Class Members;

b. Whether Defendant was negligent in collecting and storing Plaintiffs' and Class Members' PII and PHI, and breached its duties thereby;

c. Whether Defendant took reasonable steps and measures to safeguard Plaintiffs' and Class Members' PII and PHI;

d. Whether Defendant failed to adequately safeguard Plaintiffs' and Class Members' PII and PHI;

e. Whether Defendant breached its duty to exercise reasonable care in handling Plaintiffs' and Class Members' PII and PHI;

f. Whether Defendant failed to implement and maintain reasonable security procedures and practices appropriate to the nature and scope of the information compromised in the Data Breach;

g. Whether Defendant failed to provide notice of the Data Breach in a timely and proper manner;

h. Whether Plaintiffs and Class Members are entitled to damages as a result of Defendant's wrongful conduct; and

i. Whether Plaintiffs and Class Members are entitled to injunctive relief to redress the imminent and currently ongoing harm faced as a result of the Data Breach.

133. **Typicality:** Plaintiffs' claims are typical of those of other Class members because Plaintiffs' Private Information, like that of every other Class member, was compromised by the Data Breach. Further, Plaintiffs, like all Class members, were injured by Defendant's uniform conduct. Plaintiffs are advancing the same claims and legal theories individually and on behalf of

all other Class Members, and there are no defenses that are unique to Plaintiffs. The claims of Plaintiffs and those of other Class members arise from the same operative facts and are based on the same legal theories.

134. **<u>Adequacy</u>:** Plaintiffs are adequate representatives of the Class. Plaintiffs will fairly, adequately, and vigorously represent and protect the interests of the Class Members and have no interests antagonistic to the interests of the Class Members. In addition, Plaintiffs have retained counsel who are competent and experienced in the prosecution of class action litigation. The claims of Plaintiffs and the Class Members are substantially identical, as explained above.

135. **<u>Superiority</u>:** A class action is superior to other available methods for the fair and efficient adjudication of this controversy, as the pursuit of numerous individual lawsuits would not be economically feasible for individual Class members, and certification as a class action will preserve judicial resources by allowing the Class's common issues to be adjudicated in a single forum, avoiding the need for duplicative hearings and discovery in individual actions that are based upon an identical set of facts. Without a class action, it is likely that many members of the Class will remain unaware of the claims they may possess.

136. The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class members – whom Defendant has already identified (at least in part), as demonstrated by its quantification of the number of individuals impacted by the Data Breach – demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action. This proposed class action does not present any unique management difficulties.

137. Adequate notice can be given to Class members directly using information maintained in Defendant's records.

138. **Predominance:** Common questions of law and fact predominate over any questions affecting only individual Class Members. Similar or identical violations, business practices, and injuries are involved. Individual questions, if any, pale by comparison, in both quality and quantity, to the numerous common questions that dominate this action. For example, Defendant's liability and the fact of damages are common to Plaintiffs and each member of the Class. If Defendant breached its duty to Plaintiffs and Class Members, then Plaintiffs and each Class Member suffered damages by that conduct.

139. Defendant has acted and/or refused to act on grounds that generally apply to the Class making injunctive and/or declaratory relief appropriate with respect to the Class under Fed. R. Civ. P. 23(b)(2).

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

140. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

141. Defendant owed a non-delegable duty under common law to Plaintiffs and Class Members to exercise reasonable care in obtaining, retaining, securing, safeguarding, deleting, and protecting PII and PHI relating to Plaintiffs and the Class in Defendant's possession from being compromised, lost, stolen, accessed, and misused by unauthorized persons.

142. Specifically, this duty included, among other things: (a) designing, maintaining, and testing Defendant's security systems to ensure that Plaintiffs' and Class Members' PII and PHI in Defendant's possession was adequately secured and protected; (b) implementing processes that would detect a breach of its security systems in a timely manner; (c) timely acting upon

warnings and alerts, including those generated by its own security systems, regarding intrusions to its networks; and (d) maintaining data security measures consistent with industry standards.

143. Defendant's duty to use reasonable care arose from several sources, including but not limited to those identified below.

144. Defendant had a common law duty to prevent foreseeable harm to others. This duty existed because Plaintiffs and Class Members were the foreseeable and probable victims of any inadequate security practices on the part of the Defendant. By receiving, maintaining, and handling PII and PHI that are routinely targeted by criminals for unauthorized access, Defendant was obligated to act with reasonable care to protect against these foreseeable threats. Defendant alone controlled its own technology, infrastructure, and cybersecurity. Defendant further knew or should have known that if hackers breached its data systems, they would extract sensitive data and inflict injury upon Plaintiffs and Class Members. Furthermore, Defendant knew or should have known that if hackers accessed the sensitive data, the responsibility for remediating and mitigating the consequences of the breach would largely fall on individual persons whose data was impacted and stolen. Therefore, the Data Breach, and the harm it caused Plaintiffs and Class Members, was the foreseeable consequence of Defendant's unsecure and unreasonable data security measures.

145. Defendant also owed a common law duty because its conduct created a foreseeable risk of harm to Plaintiffs and Class Members. Defendant's conduct included its failure to adequately restrict access to its computer networks that held Plaintiffs' and Class Members' PII and PHI.

146. Defendant's duty also arose from its position as healthcare business. Defendant holds itself out as a trusted business associate and a trusted provider of healthcare services, thereby assuming a duty to reasonably protect the information it obtains from patients. Indeed, Defendant,

which receives, maintains, and handles the PII and PHI with which it was entrusted, was in a unique and superior position to protect against the harm suffered by Plaintiffs and Class Members as a result of the Data Breach.

147. Defendant is subject to an "independent duty," untethered to any contract between Defendant and Plaintiffs and Defendant and Class Members. The sources of Defendant's duties are identified above.

148. Defendant breached the duties owed to Plaintiffs and Class Members and thus was negligent. Although the exact methodologies employed by the unauthorized third parties are unknown to Plaintiffs at this time, on information and belief, Defendant breached its duties through some combination of the following errors and omissions that allowed the Data Breach to occur: (a) mismanaging their systems and failing to identify reasonably foreseeable internal and external risks to the security, confidentiality, and integrity of patient and member information that resulted in the unauthorized access and compromise of PII and PHI; (b) mishandling their data security by failing to assess the sufficiency of their safeguards in place to control these risks; (c) failing to design and implement information safeguards to control these risks; (d) failing to adequately test and monitor the effectiveness of the safeguards, key controls, systems, and procedures; (e) failing to evaluate and adjust their information security program in light of the circumstances alleged herein; (f) failing to detect the breach at the time it began or within a reasonable time thereafter; and (g) failing to adequately train and supervise employees with access or credentials to systems and databases containing sensitive PII and PHI.

149. But for Defendant's wrongful and negligent breach of its duties owed to Plaintiffs and Class Members, their PII and PHI would not have been accessed and compromised by cybercriminals.

150. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members have suffered injuries including:

a. Theft of their PII and PHI;

b. Costs associated with requesting credit freezes;

c. Costs associated with the detection and prevention of identity theft;

d. Costs associated with purchasing credit monitoring and identity theft protection services;

e. Lowered credit scores resulting from credit inquiries following fraudulent activities;

f. Costs associated with time spent and the loss of productivity from taking time to address and attempt to ameliorate, mitigate, and deal with the actual and future consequences of the Data Breach;

g. The imminent and certainly impending injury flowing from potential fraud and identity theft posed by their PII and PHI being placed in the hands of criminals;

h. Damages to and diminution in value of their PII and PHI entrusted to Defendant with the mutual understanding that Defendant would safeguard Plaintiffs' and Class Members' data against theft and not allow access and misuse of their data by others; and

i. Continued risk of exposure to hackers and thieves of their PII and PHI, which remains in Defendant's possession and is subject to further breaches so long as Defendant fails to undertake appropriate and adequate measures to protect Plaintiffs and Class Members.

151. As a direct and proximate result of Defendant's negligence, Plaintiffs and Class Members are entitled to damages, including compensatory, punitive, and/or nominal damages, in an amount to be proven at trial.

152. Defendant's duty of care to use reasonable security measures arose as a result of the special relationship that existed between Defendant and its patients, which is recognized by laws and regulations, as well as common law. Defendant was in a position to ensure that its systems were sufficient to protect against the foreseeable risk of harm to Class Members from a Data Breach.

153. Defendant's duties also arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

154. Defendant's duties additionally arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by businesses, such as Defendant, of failing to employ reasonable measures to protect and secure Private Information.

155. Defendant's duties further arise from the Health Insurance Portability and Accountability Act of 1996 (HIPAA), 42 U.S.C. § 1302(d), *et seq.*

156. Defendant is an entity covered under HIPAA, which sets minimum federal standards for privacy and security of PHI.

157. Defendant violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiffs' and Class Members' Private Information

and not complying with applicable industry standards. Defendant's conduct was particularly unreasonable given the nature and amount of Private Information it obtains and stores, and the foreseeable consequences of a data breach involving Private Information including, specifically, the substantial damages that would result to Plaintiffs and Class Members.

158. Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA constitute negligence per se.

159. Plaintiffs and Class Members are within the class of persons that the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

160. The harm occurring as a result of the Data Breach is the type of harm the HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against.

161. It was reasonably foreseeable to Defendant that its failure to exercise reasonable care in safeguarding and protecting Plaintiffs' and Class Members' Private Information by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems, would result in the release, disclosure, and dissemination of Plaintiffs' and Class Members' Private Information to unauthorized individuals.

162. The injury and harm that Plaintiffs and Class Members suffered was the direct and proximate result of Defendant's violations of HIPAA Privacy and Security Rules and Section 5 of the FTCA. Plaintiffs and Class Members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (ii) improper disclosure of their Private Information; (iii) breach of the confidentiality of their Private Information; (iv) deprivation of the

value of their Private Information, for which there is a well-established national and international market; (v) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face; and (vi) actual or attempted fraud.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**

163. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

164. In connection with receiving medical treatment or services, Plaintiffs and all other Class Members entered into implied contracts with Defendant.

165. Pursuant to these implied contracts, Plaintiffs and Class Members paid money to Defendant, whether directly or through their insurers, and provided Defendant with their PII/PHI. In exchange, Defendant agreed to, among other things, and Plaintiffs understood that Defendant would: (1) provide medical treatment, services, or health plan benefits to Plaintiffs and Class Members; (2) take reasonable measures to protect the security and confidentiality of Plaintiffs' and Class Members' PII/PHI; and (3) protect Plaintiffs' and Class Members' PII/PHI in compliance with federal and state laws and regulations and industry standards.

166. The protection of PII/PHI was a material term of the implied contracts between Plaintiffs and Class Members, on the one hand, and Defendant, on the other hand. Indeed, as set forth *supra*, Defendant recognized the importance of data security and the privacy of its patients' Private Information in its Notice of Privacy Practices.[65] Had Plaintiffs and Class Members known that Defendant would not adequately protect its patients' PII/PHI, they would not have received medical treatment or services from Defendant.

---

[65] *Notice of Privacy Practices*, *supra* note 5.

167. Plaintiffs and Class Members performed their obligations under the implied contract when they provided Defendant with their PII/PHI and paid—directly or through their insurers—for health care treatment, services, or health insurance premiums from Defendant.

168. Defendant breached its obligations under its implied contracts with Plaintiffs and Class Members by failing to implement and maintain reasonable security measures, protocols, and procedures to protect and secure Plaintiffs' and Class Members' PII/PHI in a manner that complies with applicable laws, regulations, and industry standards.

169. Defendant's breach of its obligations of its implied contracts with Plaintiffs and Class Members directly resulted in the Data Breach and the injuries that Plaintiffs and all other Class Members have suffered from the Data Breach.

170. Plaintiffs and all other Class Members were damaged by Defendant's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; and/or (vi) they lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of medical identity theft they face and will continue to face.

## COUNT III
## UNJUST ENRICHMENT

171. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

172. This claim is pleaded in the alternative to Plaintiffs' current and future contract-based claims.

173. By its wrongful acts and omissions described herein, Defendant has obtained an undue benefit from the PII and PHI entrusted to it by Plaintiffs and Class Members.

174. Defendant was aware of, appreciated, and/or understood the undue benefit it obtained from its transactions with Plaintiffs and Class Members.

175. Defendant, prior to and at the time Plaintiffs and Class Members entrusted their PHI/PII to Defendant for the purpose of obtaining health services, caused Plaintiffs and Class Members to reasonably believe that Defendant would keep such PHI/PII and financial information secure.

176. Defendant was aware, or should have been aware, that Plaintiffs and Class Members relied on its representations that the PHI/PII kept in its custody would be secure. Plaintiffs and Class Members would not have contracted with Defendant had they known that Defendant's information systems were sub-standard for that purpose.

177. Defendant also knew or should have known that if Plaintiffs and Class Members became aware of the substandard condition of and vulnerabilities in its information systems, Plaintiffs and Class Members would be much less likely to seek its services.

178. Defendant failed to disclose facts pertaining to its substandard information systems before Plaintiffs and Class Members made their decisions to seek medical care. Instead, Defendant suppressed and concealed such information for months after the Data Breach occurred. By concealing and suppressing that information, Defendant denied Plaintiffs and Class Members the ability to make informed decisions regarding their PHI and PII and received an undue benefit.

179. Defendant was unjustly enriched at the expense of Plaintiffs and Class Members. Defendant received profits, benefits, and compensation, in part, at the expense of Plaintiffs and Class Members. By contrast, Plaintiffs and Class Members did not receive the benefit of their bargain because they sought healthcare services on the assumption that their private information would be secure in Defendant's possession.

180. Since Defendant's profits, benefits, and other compensation were obtained by improper means, Defendant is not legally or equitably entitled to retain any of the benefits, compensation or profits it realized from these transactions.

181. Plaintiffs and Class Members seek an Order of this Court requiring Defendant to refund, disgorge, and pay as restitution any profits, benefits and other compensation obtained by Defendant from its wrongful conduct and/or the establishment of a constructive trust from which Plaintiffs and Class Members may seek restitution.

## COUNT IV
## DECLARATORY JUDGMENT

182. Plaintiffs reallege and incorporate by reference all preceding paragraphs as if fully set forth herein.

183. Under the Declaratory Judgment Act, 28 U.S.C. §§ 2201, et seq., this Court is authorized to enter a judgment declaring the rights and legal relations of the parties and grant further necessary relief. Furthermore, the Court has broad authority to restrain acts, such as here, that are tortious and violate the terms of the federal and state statutes described in this Class Action Complaint.

184. An actual controversy has arisen in the wake of the Data Breach regarding Plaintiffs' and Class Members' PII and PHI. Namely, whether Defendant is currently maintaining data security measures adequate to protect Plaintiffs and Class Members from further data breaches

that compromise their PII and PHI. Plaintiffs allege that Defendant's data security measures remain inadequate. Furthermore, Plaintiffs and Class Members continue to suffer injury as a result of the compromise of their PII and PHI and remain at imminent risk that further compromises of their PII and/or PHI will occur in the future.

185. Pursuant to its authority under the Declaratory Judgment Act, this Court should enter a judgment declaring that, among other things:

a. Defendant owed a legal duty to secure patients' PII and PHI under common law and Section 5 of the FTC Act; and

b. Defendant breached and continues to breach these legal duties by failing to employ reasonable measures to secure patients' PII and PHI.

186. This Court also should issue corresponding prospective injunctive relief requiring Defendant to employ adequate security protocols consistent with law and industry standards to protect Plaintiffs' and Class Members' PII and PHI.

187. If an injunction is not issued, Plaintiffs and Class Members will suffer irreparable injury and lack an adequate legal remedy in the event of another data breach of Defendant's systems. The risk of another such breach is real, immediate, and substantial. If another breach of any of Defendant's systems occurs, Plaintiffs and Class Members will not have an adequate remedy at law because many of the resulting injuries are not readily quantified, and they will be forced to bring multiple lawsuits to rectify the same conduct.

188. The hardship to Plaintiffs and Class Members if an injunction is not issued exceeds the hardship to Defendant if an injunction is issued. Plaintiffs and Class Members will likely be subjected to substantial identity theft and other damage. On the other hand, the cost to Defendant

of complying with an injunction by employing reasonable prospective data security measures is relatively minimal, and Defendant has a pre-existing legal obligation to employ such measures.

189. Issuance of the requested injunction will not disserve the public interest. To the contrary, such an injunction would benefit the public by preventing another data breach of Defendant's systems, thus eliminating the additional injuries that would result to Plaintiffs, Class Members, and patients whose confidential information would be further compromised.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, individually and on behalf of all other members of the Class, pray for relief as follows:

A. For an order certifying the Class under Rule 23 of the Federal Rules of Civil Procedure, naming Plaintiffs as Representatives of the Class and appointing Class Counsel;

B. For an order finding in favor of Plaintiffs and the Class on all counts asserted herein;

C. For compensatory damages on behalf of Plaintiffs and the Class;

D. For punitive damages on behalf of Plaintiffs and the Class;

E. For an order of restitution and all other forms of equitable monetary relief;

F. Declaratory and injunctive relief as described herein;

G. For disgorgement and/or restitution as the Court deems appropriate, just, and proper;

H. Awarding Plaintiffs reasonable attorneys' fees, costs, and expenses;

I. Awarding pre- and post-judgment interest on any amounts awarded;

J. For reimbursement for all costs and expenses incurred in connection with the prosecution of these claims; and

K. Awarding of such other and further relief as may be just and proper.

**JURY TRIAL DEMANDED**

A jury trial is demanded on all claims so triable.

Dated: September 16, 2026

Respectfully submitted,

*/s/ Gary F. Lynch*
**LYNCH CARPENTER, LLP**
Gary F. Lynch (Bar ID # 29779)
1133 Penn Ave, 5th Floor
Pittsburgh, PA 15222
T: 412-322-9243
gary@lcllp.com

**LYNCH CARPENTER, LLP**
Gerald D. Wells, III*
1760 Market Street, Suite 600
Philadelphia, PA 19103
T: 267-609-6910
F: 267-609-6955
jerry@lcllp.com

**AHDOOT & WOLFSON, PC**
Andrew W. Ferich*
Brian J. Devall*
201 King of Prussia Road, Suite 650
Radnor, PA 19087
T: 310-474-9111
F: 310-474-8585
aferich@ahdootwolfson.com
bdevall@ahdootwolfson.com

*Counsel for Plaintiffs and the Proposed Class*

**pro hac vice* forthcoming